Please all rise. Hear ye, hear ye, hear ye. This Honorable Public Court of the 2nd Commission District is now back in session. The suit is adjourned. The Honorable Mary S. Shostakovich is idle. Good morning. You can rest easy. Your Honor, this case is an article 2-105-0157. F.R.S. Development Co. v. Cooperative America's Union Bank & Trust and M.I. Legal Properties LLC Counter Plaintiffs Appellant The F.R.S. Development Co. v. Cooperative Counter Defendant Appellant Pardon me on behalf of the Counter Plaintiffs Appellant Attorney Mr. James L. Wright Pardon me on behalf of the Counter Defendant Appellant Attorney Mr. David W. Carlson Good morning. Mr. Wright, you may proceed. Good morning, Your Honors. You may please the court. This case arises from a foreclosure judgment entered in August 2009. The issue before this court is whether that foreclosure judgment foreclosed recapture rights which F.R.S. and F.G.M. owned against two parcels of real estate that we are calling the Garley parcel and the Fort Yager parcel. Is this a case of first impression in Illinois? It is, Your Honor. None of us have been able to find cases that either state that recapture rights are or are not real estate or personal property nor have we found a foreclosure case involving recapture rights. You know, I was mentioning this to Justice Sienoff. My old real estate professor in law school was Bob Cradoville and he always told us, you know, real estate issues come in all jurisdictions and if you can't find a case in Illinois, you could look elsewhere. A well-reasoned case decided in any state often commands the respect of other states, but I couldn't find a case anywhere that says recapture rights are real estate. Have you found any? Have not, Your Honor, but we have not found either a case that says recapture rights are personal property. Neither party has found those. Both parties have been at it. The cases that talk about personal property are in the context of a case in which the person owning the rights does not own the underlying real estate. We have a unique situation here, Your Honor. Counsel, with respect to the consent agreement regarding the foreclosure suit in August of 2009, August 25, 2009, the bank and the bank CEO actually signed a release of the roadway and the intersection recapture rights, and you agree that's a genuine document, that release, correct? That is a genuine document, Your Honor. All right, so explain how the bank can release those rights as part of a negotiated settlement of the foreclosure suit and then turn around and claim it foreclosed those rights. If it was released, how can you foreclose it? First of all, that release, as all the parties have recognized, was a release of personal property interests. That is clear. It was a personal property release. It referred to the general intangibles, personal property rights, and if the recapture rights are an interest in real estate as we contend, a release of a UCC, a release of a financing statement, a release of a commercial security agreement simply cannot release that interest. So it wouldn't be covered is what you're saying. It wouldn't be covered. And, again, the situation here is the mortgagor, the borrower, owned the land, the two parcels, against which it also owned the recapture rights. Now, to the extent we would have a typical situation where those mortgagors have recapture rights against other parcels that they did not own, that release would release the recapture rights as to those parcels because if you don't own the underlying land, you still have a claim against that land, but all you're receiving is the stream of income. So it's – may I proceed? Sure, go ahead. So, again, the recapture rights in any case are rights against real estate, and if you own the underlying real estate, you own the whole thing. Well, but you use the language of various other statutes to get to that conclusion, the conclusion that these recapture rights are an interest in real estate, but in order to – I mean, the principles of statutory interpretation are, as we all know, first we look at the language of the statute itself. Only if that language is ambiguous do we look elsewhere and then ascertain legislature's intent. But you don't claim that that language is ambiguous, do you? I didn't remember reading that in your brief. The language of the release? Section 951, I'm sorry, Section 951, the statute that really gives the authority to the municipality to enter into an agreement regarding recapture rights. We do not contend that that's ambiguous, no. So how can we look further than the plain language of the statute then? Well, the plain language of that statute, or at least the next section, 952, classifies those rights as a charge against the property. So, in fact, we believe that's evidence of a legislative intent, that these are interests in real estate. They are a charge against the property. So that section, if you want to look at it, you're referring to 952. What part of this you're saying that where it says, let's see, any contract entered into between corporate authorities of a municipality and a subdivider shall be filed with recorder, okay, recording shall serve to notify persons interested in such property of the fact that there will be a charge in relation to such property for the connection to and use of the facilities. This is a notice section, right? It is a notice. But, again, it does use the word charge. It is a directive that if you have a recapture right, if those are being created, you must record a notice in the land records. A charge, excuse me, just one second, charge meaning like a toll or a payment. I mean, if you don't use the highway, you know, you don't pay the toll. So charge, I would think, is used in that sense, right? How could it be used to evidence the meaning of an interest in real estate? To me, a charge against land is an interest or a claim against real estate. And simply because there is a choice whether one develops that land or not, to me, doesn't determine whether or not it's an interest or a charge against that real estate. Certainly, one can develop it or not. But if you develop it, you have a charge that you must pay, and that is a charge against that land. The charge is not against the land that was owned by plaintiffs. The charge is to notify prospective buyers of property within that developed tract of land that they're going to have to pay a charge, the recapture right, or for the sake of a better word, user fees that run with the newly acquired property. It has nothing to do with the land that FRS owned, does it? It does, Your Honor. With all due respect, it's a charge against those two parcels, the Garland parcel and the 40-acre parcel. It represents income that's going to be paid by the other property owners for the development that the owners of those two parcels are responsible for. The developer doesn't pay. Right. No. The person that pays is the owner of those two. The landowner, correct? The landowner of those two parcels. They are the ones that are going to pay. Those two parcels, Garland and 40-acre parcel, have been benefited by the construction of the roadway improvements, so those owners must pay the charge. Now, in this case, that was FRS and FGM as to those two parcels. They had a charge against those two parcels. It was an interest that they owned in those two parcels. It ran with those two parcels. As FRS acknowledged repeatedly when they filed memoranda of their transactions regarding those rights, they recorded memoranda of those rights in the land records. They acknowledged that those were obligations which ran with the land, which were appurtenant to the land. Again, they recorded them in the recorder's office, and any owner of those parcels had that obligation that ran with the land. But now, this isn't like a lien in the benefited properties. I think you're arguing that maybe it is, but if the legislature had intended to create a lien, it would have said so because it's done in other sections of the code, as we see. So it doesn't have that characteristic. It has not been classified as a lien. Now, first of all, Your Honor, we never argued that. There was an intimation in the opposing briefs. We never argued, we never classified it as a lien. But to me, the question of whether or not it is a lien is not determinative. You don't have to have a lien in order to have an interest or a claim or a charge against real estate. It is true. Go ahead. There is another division in the municipal code where they establish a lien in favor of the municipality. Now, that's a different situation. What's involved there is the municipality's construction of an improvement, payment for an improvement outside the boundaries of the municipality, and the code sets up a specific provision for the municipality to go to the local court and establish that right to impose, to recover that cost for the improvement, which it paid for outside its boundaries, and then it allows them to establish a lien. But simply because they're given a lien under those circumstances does not mean that here, where we don't have a lien, that we don't have an interest in real estate. They're different situations. Who incurred the cost in these improvements? Interesting question. Here it was not FRS. It was not FGM. They traded back and forth this right of reimbursement several times, and, in fact, it was Huntley Venture, the developer of the Talamore parcel, that paid for those improvements and incurred that cost. They no longer, Huntley Venture no longer had the right of reimbursement. They traded it away. They sold it away. But they incurred the cost. And who do the landowners pay for the benefits that they receive? Well, once it's set up, they would, in fact, it would be funneled through the village and then paid on to the person that owns the rights. So we're really talking about the developer's contractual right to have the municipality collect these fees or tolls. I mean, isn't that really a logical way to look at it? Well, the village does, in fact, receive those payments. But, again, that doesn't make it any less of an interest or a charge or a claim against that real estate. It's simply a question of where those payments go in order to satisfy that claim. Well, 951 goes beyond that, really. If you look at it, I mean, it gives the authority to the municipality to charge these fees to the owners of the benefited property. So it's a statute that authorizes the municipality to enter into this contractual agreement and to then collect those fees. So it's not just a collection statute. I mean, at least looking at the plain language, which, again, is where we have to start to discern the meaning of this because this is where it all starts and ends, I guess. Well, the first agreement in this case was the facilities expansion agreement back in 2004. And it was that agreement that gave granted the right to FRS to recapture that cost. And as we point out in the brief, the opponents acknowledged in the trial court below that that's when those recapture rights were vested. So what happens later on is simply a matter of how those rights are satisfied. It doesn't determine whether or not those rights are an interest in real estate. It's a question of how one satisfies or pays off those rights. Is it relevant at all where Huntley received the money to make the improvements? If I understand the question, it's not entirely relevant because here, again, the improvements were paid for by a third party unrelated to this litigation. Huntley Venture paid for those improvements, incurred the cost of constructing them, and then later on somebody else is going to be paid, whoever holds those recapture rights. Who holds the recapture rights? Well, I guess that's the issue in the case, Your Honor. FRS and FGM believe that they hold those rights and are entitled to them, but even though they did not construct the improvements, did not incur the cost of the improvements, those rights were transferred back and forth. Each time that happened, they recorded a notice of that in the recorder's office. They stated that these rights run with the land. Well, that was my question. Huntley incurred the expense of where did they get the monies, or is it relevant as to where they got the monies to pay for those improvements and wouldn't that person, as opposed to your client, be the one entitled to the recapture rights if they hadn't signed it over? Okay, and I'm sorry if I misunderstood your question, Your Honor, but Huntley Venture, not the village of Huntley, paid for it. And they paid for it as a cost of development. Huntley Venture now is not going to get that money back under any case. The village of Huntley has not paid for anything. Right. Okay. These were not village improvements. Right, right. I understand that. I guess my question is it would make sense that whomever it was who made the improvements to the property would be maybe the person who may have, quote, unquote, a lien on these recapture rights. That's why I was saying that. But Huntley kind of signed it over to these other two individuals. How is it that you are justifying your client's rights to have these monies when they didn't invest any monies into this improvement? Okay. And the bank is not asserting that it has the rights. The bank is asserting that those rights were foreclosed, they were extinguished. In the language of the Foreclosure Act, they were terminated upon entry of the foreclosure judgment. So then we come back to the same question is whether or not these recapture rights of personal property which are able to be foreclosed upon. That's correct, Your Honor. We come right back to this question. That's correct. Anything further? Just one. If a mortgagee could extinguish a developer's right to be reimbursed by going ahead and foreclosing on the benefited land, wouldn't that throw cold water on and certainly discourage growth? No, in all due respect, Your Honor, because of exactly what happened here. The developer that holds those rights has the right to transfer those. You can transfer land. You can transfer the recapture rights with them, separate from them. That's what happened here. It was a private transaction between private parties. FRS and FGM traded those rights back and forth. Before the foreclosure, they held those rights against land that they owned, and they took the risk of mortgaging all of those rights with the land in exchange for a $12 million loan.  When they were unable to pay the loan and defaulted, they lost their rights in that property. It's simply a private business matter. Thank you. Thank you. I'm going to give you a few minutes in your rebuttal to address attorney's fees, since we didn't get to that here. I'm sorry, to address? Attorney's fees. The issue prevailed with me. We'll talk about that when we come back, though. Okay, thank you so much. Mr. Carter. Thank you. Good morning, Justices, and may it please the Court. I realize the Court's spent a lot of time on the issue raised by the bank. If I could just spend a few minutes on the agreement itself. In this particular case, there was a clear meeting of the minds, and I understand the Court gets that. When the documents were drafted by the bank's attorneys for the $12 million loan in 2006, I believe it was, what happened was FRS acquired the rights in January of 2006 by the settlement agreement with Huntley Venture. FGM and FRS acquired 100% of the recapture rights. Frank then took those rights in the spring of the same year, went to the bank, borrowed money, pledged those rights along with the real estate and everything else he owned to the bank, and they made the loan. Those bank lawyers for $12 million knew what they were doing. They had the mortgage, and they said with regard to the personal property rights, the intangibles, the chattel, whatever you want to call them, the clear rights acquired under that 2006 agreement, we're going to secure that not through the mortgage general boilerplate language. We're going to secure it through the UCC that Mr. Cranville told us to do because it's personal property, and we're going to secure it with UCC-1s. So the security agreement was signed. The UCC-1s were signed, specifically referring to the 06 agreements in both FGM and FRS, or two security agreements, and those were attached to the mortgage foreclosure as Exhibit 16. Exhibit 16 is referenced specifically in the complaint. It's a 90-page complaint or a 40-page complaint, and Exhibit 16 has both security agreements, both UCC-1s attached, and in the foreclosure count, 13, which is like a page 40 of the complaint, the last count. It specifically alleges we're going to foreclose those rights in this count. We're not going to rely on the mortgage foreclosure counts. We're going to foreclose it in that count, and that's what they did. And wasn't that count eventually dismissed? That happened six months later, so the foreclosure complaint was filed in January or so, the amendment in January or so of 2009, three years later, there was a default. Within that year, in 2009, in July, the attorneys get together, and the reason I talk about the attorneys' letters, which is at C-1623 and C-1658, it's because there was a meeting of the minds, and the meeting of the minds started before the settlement agreement was signed, and it started in the summer when they started negotiating the resolution of this huge foreclosure. This girl, on behalf of the bank, did an excellent job. It was a 90-page foreclosure complaint. It was massive, and the organization of it was really impeccable. And they got together, Heather Macklin and Jim Scarr got together, and they have letters going back and forth to each other at those pages, C-1623 and C-1658, and Jim Scarr says, this is the language I want in there for the bank to release its security interest in all of the channel and general intangibles, including the settlement agreement rights that he obtained in 2006. Then he writes and says in the letter, in the letter to her, I want that included in a specific release of collateral, release of security interest. So then on August 25th at 1715, the parties sign the settlement agreement. That exact same language from those letters is plopped into the agreement in Section 8 that we keep referring to, and it says the bank's going to release that security interest. That's the promise. In exchange for Frank signing the consent decree, they're going to let him keep his collateral, and they're going to sign a release of settlement of security interest to evidence that. And that's the February 9th, 06, settlement agreement? That's the February 9th, right. Okay. There's a couple of typos in there that drag through this, but it's basically February 9th, 06 is the... Right, the settlement agreement. Right. So then to perfect that, to complete that settlement agreement that was signed on August 25th, 09, three days later on August 28th, 09, at 1825 and 1828, Shari Zank, the bank's CEO, signs the release of security agreement for FRS and the release of security agreement for FGM, releasing those specific roadway recovery, I'm sorry, roadway and intersection recapture payment back to FRS and FGM, and authorizes FRS to record a UCC-3 terminating those security interests. And that's what happens next. FRS, or whoever, Frank Satar, records UCC-3s terminating that security interest in 1826 and 1829. And then finally, two days later, or the same day, on August 28th, the same day the releases were signed by Shari Zank at the bank, the consent foreclosure, 43 pages is entered, and on the last page, this is the key, on the last page, count 13, the UCC count, is dismissed with prejudice. So the parties are in agreement before the settlement agreement, the meeting of minds of the lawyers. Shari Zank and the bank, FRS signed the agreement, signed the releases, the consent foreclosure is entered. And then just to follow up, and then I'll get to the legal issue that you've been talking about, the deeds, the deeds, in an email from Jim Scar in 1892, Jim Scar writes to Heather Macklin, who's the attorney for the bank, everybody's on the same wavelength, and says, as you requested, the bank's requesting these deeds, the deal's done, the foreclosure's entered, the releases, UCCs, all that's dead. And she requests deeds, they don't object, they send her deeds, and they put it in a reservation with regard to the recapture rights. So that's the after. So before the settlement agreement, there's a meeting of minds, the settlement agreement releases, there's a meeting of minds, and afterwards in the deeds, there's a meeting of minds, because there's no objection, she records half the deeds, I don't know why she didn't record it. What is there a meeting of the minds about? That it's the nature of the interest, or the fact that there will be a release? I mean, I asked counsel the question, you know, how can the bank release those rights as part of a negotiated settlement of a foreclosure suit, and then turn around and claim it foreclosed those rights, and his answer to me was, well, because they're an interest in real estate. So what are you saying there was a meeting of the minds about? That Frank Setar and his corporations would walk away and be able to put in his pocket those recapture rights to use them in the future, should he choose to, or receive the money. Whether they were an interest in real estate or personal? Absolute personal property, no doubt about it. So why is there no doubt about it? Because the parties treated it as personal property, via all the things I just said. The UCC forms? The lawyers doing the security interest, how they secured it, how they used it. Because they referred to it as a security interest and used the UCC instruments to, so you think that's determinative? I think that stops the bank from making the arguments they're making, res judicata and breach of contract, the agreements we made, all prevent, eliminate the need for the court to get to this issue. I don't want the court to get to this issue. It's not right for you. The way it would be right for you is if we didn't have all those agreements. If we had none of those agreements, and it was left up in the air, and Frank all of a sudden says, hey, I own those recapture rights, then I can see a fair fight. I don't see it here because we had a deal. The bank never expressed surprise, did they? Never. When you're talking about the recapture rights as if they're personal property as opposed to real estate. Is there any objection in any of the correspondence from the bank? The first time that was ever raised was when Sitar went to the village. I think you, I can't, oh, yeah, this is how the whole case started. Frank goes to the village in 2000, I'm going to guess, 13. Yeah, 13, I believe. He goes to record the recapture rights. New council comes in for the bank. Two years later. And when we go, we actually went to the city council, this is all videotape, and asked for the recapture, and the mayor stands up and says, I received a call from Mr. Zank, the attorney for American Community Bank, and there seems to be an issue. You need to resolve that issue before we're going to pass a recapture. We took that tape. We filed a suit against the village to enforce the village to honor their promise back in the FEA days that they would enact the capture upon our request, and they ultimately did, so we backed off of that complaint, and that's how they ended up being the plaintiff. So you're saying we don't have to reach this issue? That's my position. My position is it's not right for this court to make that first impression ruling. Because? Because the parties have an agreement. It's not ambiguous. There's absolutely no reason to get to that legal issue. It's abstract. It's not right. It's not before the court. We had a deal. They're in breach of contract. You never get to that issue. I'll get to it. Can I get to the issue then that you've all been discussing, the legal issue, if you were to go that direction? Okay. So the statute itself, I've never done this before, but the statute's kind of wordy, and rather than try and direct you, could I hand out the statute with some underlining so I can make my argument so we're all on the same page? Do you have an objection, counsel, to that? We've both got the statute in front of us. We have the statute in front of us. He's saying he wants us to have it underlined. Do you have an objection? You know, we do have a statute. Why don't you just highlight in your oral argument what you want us to take note of? It's on page 5 of the blue brief. Yeah. Okay. Well, okay, so the statute consists of 5-1 and 5-2, of course, and then there's 4-2, which is attached for a reason, and 4-3. So first of all, getting to the if the legislature knew how to write it, they should have written it that way type of thing, If you go to the statute 9-5-1 was written in 1972, and any amendments, of course, were after that. The statute in 9-4-2 and 9-4-3 was written in 63. Ten years earlier, there were three amendments to Section 4, and all of those amendments took place before 1970. So we know that 9-4 completely existed, and all its amendments were done by the time 9-5-1 and 9-5-2 were written in October of 1972. So when the legislature went to write 9-5-1 and 9-5-2, they were staring at 9-4-2, the one just above it, right? And they added 9-5-1 below it. So they knew that if they wanted it to be a lien against the property, if they wanted it to be a charge against the property, they knew how to say that. But instead, what they did in 9-5-1, in the middle of the statute, it says, the corporate authorities may by contract, the word contracts is continually used through this. We know it's an agreement that's between the village and the developer. It says, the corporate authorities, right in the middle, may by contract with the subdivider agree to reimburse the subdivider for a portion of the cost of the improvements from fees charged to the owners of the property. Not charged against the property, charged to the owners. That's the toll booth argument. It's the best argument I could come up with. You can agree with the developer that he's going to put in all these improvements and if it benefits somebody else, then you can charge this other person who owns the property for using that improvement. And then if you drop down about seven lines, it says, the contract again shall provide that the municipality shall collect fees charged to the owner. It's the village's duty to collect those fees. They're not collecting from the property, they're collecting from the owner. That's the second time the owner is used. The third time is about four lines down, it says, at any time before connection to the property, your use of the property of each owner. So three times in that same paragraph, they're talking about the owner of the property being the key, not the property. If it was a lien against the property, they would have said so. And then, of course, the notice provision. We all know what the notice stands for and the list pendant's analogy. But the last phrase that Justice, I can't remember which one I referred to, the very last phrase, it says, there will be a charge in relation to the such property for the connection and use constructed under the contract. It doesn't say it's going to be a charge against the property. At page 13 of their brief, they use the same words Jim used just now. It's going to be a charge against the property. That's not what it says. It says it's a charge in relation to the property, which it is, but it's for the use of it. You can't use my improvements. I put $12 million or whatever, a lot of money, I think it was $19 million worth of improvements, that Frank Setar bargained with. He reduced his price in the 06 settlement agreement by taking that. He took those rights. He's entitled to be reimbursed a portion of that, and he wants it charged against the owners. It's not a charge. It's a charge in relation to that property if you want to use my improvement, but it's not against the property. Now, if in a foreclosure proceeding the developer wants to give up those recapture rights, he can do so, correct? In a foreclosure? In this case. As opposed to your argument is in this case he strictly reserved those rights. As opposed to an agreement. Can it go the other way? Then I think we would be back here. That's a case of first impression. If we didn't have the agreement, then I think the argument that would be before you, which is the argument I was just about to make, which was made in our brief, is that the statute doesn't allow that. It's treated as personal property. It's not real estate, right? So it's not subject to foreclosure. That's argument number one. I won't go through all that again. The second argument is that it's in co-agents. So then if he couldn't do that, he couldn't give up that recapture right, why was it necessary to have an agreement that he maintain those recapture rights? Wouldn't it have been without saying? Perhaps that's true depending on the result of a legal issue. But clarity. The lawyer didn't blow it. Jim Scott knew exactly what to ask for, and Heather Macklin gave it to him. It could not have been clearer among very sophisticated lawyers and very astute businessmen. They knew exactly what they were doing. They could have said, no, we are not giving you those recapture rights. That would have been the flip side. They should have torn that agreement up and said forget it, and then I bet you that foreclosure would have been a lot clearer than the boilerplate provision that's in all foreclosures. You know, it's against every lane and climber and so forth. They would have said specifically your recapture rights. Right, right. Would you like to wrap up briefly? Yeah, so the recapture rights, when you get to the legal issue, you get past all the agreements and you want to get to the legal issue, the recapture rights are inchoate. That dollar case is very strong because it's the only thing we have to prove that inchoate rights are not subject to foreclosure. That case says that. And actually, if you research it, there's a lot of law review articles that talk about it, and they use that case, they use the dollar argument. We know the dollar doesn't exist, but the point is that the right hasn't righted it in 11 and it wasn't righted it. We didn't forego to get the recapture rights until two years later. So they may never have come into play. They were never something that could be foreclosed on. Thank you. Thank you very much. I appreciate it. Mr. Wright. If I could address first a question raised by Your Honor with respect to the fact that there was a question was there a surprise that had been expressed at any point in time. And, in fact, there was not until such time as the SATAR group, FRS, attempted to enforce those rights. Until that time, it was the bank's belief that those rights had been foreclosed. When they saw actions being taken to, in fact, enforce those against land that they now own, well then, yes, they took action at that point in time. Well, what is the effect of, if you want to respond to counsel's argument, of all of these legal documents, the negotiations back and forth? Weren't the recapture rights given up? Recapture rights as against any parcels that were not owned by FRS and FGM were, in fact, released. So there are going to be roadway improvements that will benefit a number of parcels. And FRS or whoever holds those recapture rights would still own those rights against parcels that were not foreclosed. And, for example, in the 2006 settlement agreement that counsel referred to between FRS, FGM, and Huntley Venture, there were references, first of all, to a number of personal property rights, as we pointed out in the brief. There were closing participation fees to be paid. There were other rights in the agreement. There were references to recapture rights against the Garland parcel, the 40-acre parcel, and, for example, a 15-acre parcel. Now, that's not the subject of us in front of this court right now. And, again, to the extent that there were recapture rights owned against other parcels, FRS and FGM owned rights, owned interests in those parcels, but they didn't own the underlying parcels. In that situation, any of those rights were released. But here, where you also own recapture rights against parcels which you own and you mortgage those parcels, and the mortgage clearly states that you grant all interests, all rights, everything you have in those parcels to the bank, well, then you have mortgaged the recapture rights in those parcels. Was that done here, though? I'm sorry? Was that done here? That was done here with respect to these two parcels that are at issue, Garland parcel and the 40-acre parcel. Recapture rights were owned against those parcels. They were interests in those parcels. They were claims against those parcels. Those parcels were mortgaged. Everything in those parcels was mortgaged. Then those mortgages were foreclosed. Take a minute to talk to us about the attorneys' fees. The attorneys' fees? Your Honor, there is a provision in the settlement agreement which led to the stipulation and to the judgment foreclosure, which refers to the prevailing party under that settlement agreement. And both parties relied at the trial court upon that provision, claiming that if they were to prevail, they would be entitled to attorneys' fees. It's our belief, of course, that the bank should have been the prevailing party and should be the party awarded those fees. Any questions with respect to attorneys' fees? No, but I have another question. I'm sorry. So you're saying that these agreements with respect to the collateral that was given were as to other pieces of property and not the 40-acre and not the Garley-Hardy parcel? Is that what you're saying, that these security interests, the UCC-1, and then later the UCC-3, related to other property, not the property we're talking about here? Yes and no, Your Honor. And I'm sorry. Let me try to clarify. I apologize. I'm a little confused. Let me try to make myself clear. Certainly those releases, first of all, applied to everything. All you can release on a personal property interest, all you can release with respect to a commercial security agreement and a financing statement is what was given in the security agreement itself. You can only release what you had. And those were personal property interests. Those were not recapture rights against land that they owned. Now, to the extent that there were personal property rights owned by FRS, general intangibles of any kind, closing participation fees, any kind of general intangible, they released those. They also released any recapture rights against parcels that were not mortgaged to the bank. Because if I own the land, if I own the land and I also own the recapture rights against that land, I have the whole thing. And when I mortgage everything to the bank, I give it all to the bank. Now, if there's another parcel out there that I don't own, clearly I can't mortgage that to the bank, but I do have a right to receive a stream of income with respect to that parcel based upon the claim I have against that parcel. And that stream of income can be secured by a UCC interest. It's the nature of taking a collateral position in either personal property or real property. Thank you so much. Thank you, Your Honor. Gentlemen, thank you so much for your time here today. Your case will be taken under consideration at decision-writing. And, of course, we are in a recess until after lunch, or after conference and then after lunch. So thank you again.